# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                           Case No. 12-CR-1165 RB

STEVEN KASEY DUPREE,

      Defendant.

## PROPOSED FINDINGS AND RECOMMENDED DISPOSITION[1]

**THIS MATTER** is before the Court on *Steven Kasey Dupree's Motion to Suppress (Doc. 40)*, filed June 25, 2012. The United States filed its response to the motion on July 10, 2012. [*Doc. 42*]. No reply to the motion was filed. On July 12, 2012, a hearing on the motion was set for August 1, 2012, in front of United States Visiting District Judge J. Thomas Marten. [*Doc. 43*]. On July 27, 2012, counsel for Defendant filed an unopposed motion to continue the hearing on the motion to suppress, stating that Defendant had requested to subpoena several witnesses for the suppression hearing, and Defendant's counsel needed additional time to prepare and serve the subpoenas. [*Doc. 46*]. On July 30, 2012, this motion was granted by Judge Marten. [*Doc. 47*]. On August 10, 2012, United States District Judge Robert C. Brack referred the motion to suppress to the undersigned for a hearing, if necessary, and proposed findings and a recommended disposition. [*Doc. 48*]. On August 15, 2012, Defendant filed a motion for an evidentiary hearing asking for a

---

[1] **Within fourteen (14) days after a party is served with a copy of these Proposed Findings and Recommended Disposition, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommended disposition. A party must file any objections with the Clerk of the United States District Court for the District of New Mexico within the fourteen (14) day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed. Pursuant to Fed. R. Civ. P. 72(b)(2), a party may respond to another party's objections within fourteen (14) days after being served with a copy of the objections.**

hearing on the motion to be set on August 31, 2012, or later.  [*Doc. 49*].  On August 22, 2012, the undersigned granted the motion for an evidentiary hearing, and set the hearing for August 30, 2012. [*Doc. 51*].  On August 24, 2012, the undersigned held a status conference regarding the evidentiary hearing, at which counsel for Defendant stated that he would want to file supplemental briefing after the hearing.  [*Doc. 52*].

An evidentiary hearing was held on August 30, 2012, at which counsel for both parties were present and presented oral argument, and Defendant was also present.  *See* [*Doc. 55*] (Clerk's Minutes) and [*Doc. 56*] (Transcript).  At the hearing, counsel for Defendant asked for additional time in which to file supplemental briefing, and the Government did not object.  *See* [*Doc. 55* at 3] and [*Doc. 56* at 100-01].  The Court also reminded the parties of the mid-October trial setting, and counsel for Defendant stated that he would move to continue the trial.  [*Doc. 55* at 3] and [*Doc. 56* at 102].  Furthermore, the Court informed counsel of her schedule in September involving the criminal docket and that after the criminal docket, she would be gone until the end of the month (attending a seminar).  [*Doc. 56* at 101].  The undersigned entered deadlines for the requested supplemental briefing allowing only ten business days for the brief and response brief, and only five days for the reply brief.  [*Doc. 55* at 3] and [*Doc. 56* at 101].

On September 18, 2012, Defendant filed an unopposed motion to extend the briefing deadlines by fourteen (14) days, stating that "the parties are awaiting supervisory approval of a proposed plea disposition in this case." [*Doc. 58*].  The undersigned granted the unopposed motion and extended the briefing deadlines by fourteen (14) days.  [*Doc. 59*].  On October 1, 2012, Defendant filed Proposed Findings of Fact and Conclusions of Law [*Doc. 61*], and the United States submitted a response to Defendant's Proposed Findings of Fact and Conclusions of Law on October 11, 2012 [*Doc. 66*].  Defendant's deadline to file a reply brief was October 16, 2012, but

he did not file one, despite having asked the Court for time to file supplemental briefing and for an extension of the original deadlines for such briefing.  Also, Defendant did not notify the Court that he did not intend to file a reply.  Having considered the parties' submissions, the evidence submitted at the August 30, 2012, evidentiary hearing, relevant law, and the record in this case, the undersigned recommends, for the reasons set forth below, that ***Steven Kasey Dupree's Motion to Suppress (Doc. 40)*** be **DENIED**.

## I.  *PROPOSED FINDINGS OF FACT*

At the August 30, 2012, hearing on the motion to suppress, the United States presented the testimony of Deputy Mick Waldrop [*Doc. 56* at 9-58], and Defendant presented the testimony of Marci Dworkin (*id.* at 58-80) and Agent David Alvidrez (*id.* at 81-85).  The Court found the testifying witnesses credible, except where indicated below.  The Court admitted three pictures and an incident report into evidence (*Government's Exhibits 1, 2,* and *3* and *Defendant's Exhibit A*).  *See* [*Doc. 56* at 9 and 30] (copies of the exhibits are filed as attachments to these proposed findings).

On February 7, 2012, Deputy Waldrop was contacted by Marci Dworkin, who told him that she found Brooke Jacobsen in a car in Ms. Dworkin's driveway, that Ms. Jacobsen had been beaten badly, and that Ms. Jacobsen feared that Defendant was going to kill her.  [*Doc. 56* at 11-13].  Ms. Dworkin also told Deputy Waldrop that Defendant had eight illegal immigrants at Ms. Jacobsen's house, where Defendant had been staying.  *Id.* at 13.  Deputy Waldrop did not know where Ms. Jacobsen was.  *Id.* at 16.  Ms. Dworkin thought that Ms. Jacobsen would go to Ms. Jacobsen's house, and she asked Deputy Waldrop to go there to look for Ms. Jacobsen.  *Id.* at 71.  Ms. Dworkin told Deputy Waldrop where Ms. Jacobsen's house was (*id.* at 13-14), and Deputy Waldrop and Bobby Brookhouser, a detective, went to the house (*id.* at 16-17).

Deputy Waldrop and Detective Brookhouser drove through an open gate to get to the house. *Id.* at 36.  Deputy Waldrop and Detective Brookhouser knocked on the back door of the house and no one answered.  *Id.* at 17.  They looked through the windows of the house and did not see anybody, and then the door to a balcony on the second story opened and smoke started coming out of that door.  *Id.* at 17-18.  Deputy Waldrop and Detective Brookhouser went to the front door of the house and a Hispanic man was there and said that the front door did not open, so Deputy Waldrop and Detective Brookhouser went back around to the back door and the Hispanic man came outside.  *Id.* at 20.  Detective Brookhouser asked the man how many people were inside and he said three, including himself.  *Id.*  A second man subsequently came out of the house because the first man told him to come out.  *Id.* at 21-22.  The two men yelled at the third man to come out of the house, but he did not come out, so Detective Brookhouser went into the house to see who else was in there.  *Id.* at 22-23.  Detective Brookhouser found the third man and brought him out of the house. *Id.* at 23.  Detective Brookhouser asked the men if they had their papers and they stated that they did not.  *Id.* at 23.  Deputy Waldrop and Detective Brookhouser called Border Patrol, who took the men into their custody.  *Id.* at 24.

Also on February 7, 2012, Deputy Waldrop made phone calls inquiring into Ms. Jacobsen's whereabouts, and called Ms. Jacobsen's cell phone, but he was not able to reach her.  *Id.* at 32-33. The following day, Deputy Waldrop saw Ms. Jacobsen at a restaurant, and he did not generate a police report because Ms. Jacobsen did not want to pursue the matter.  *Id.* at 50-51.

## II.  PROPOSED CONCLUSIONS OF LAW

Defendant contends that all evidence derived from the search and seizure on February 7, 2012, be suppressed, including the "bodies" of the three men found at the house. [*Doc. 40* at 1] and [*Doc. 56* at 5-6].  Specifically, Defendant argues that the police did not have a

warrant or "probable cause plus exigent circumstances" to justify the search of the house where the three undocumented immigrants were seized. [*Doc. 40* at 2]. Defendant also contends that the officers wrongfully entered the curtilage of the property without exigent circumstances, so "all fruits from the search, []includ[ing] the bodies of the illegal aliens and all statements derived therefrom" should be suppressed. [*Doc. 61* at 7].

In its response to the suppression motion, the United States contends that: (1) the United States Border Patrol had probable cause to arrest Defendant; (2) Defendant has no standing to suppress the identity of the undocumented immigrants even if they were illegally seized; (3) Defendant did not have a reasonable expectation of privacy in the house where the undocumented immigrants were found; and (4) the officers legitimately entered the curtilage of the property pursuant to exigent circumstances because they were concerned that Ms. Jacobsen was in danger. [*Doc. 42* at 4-7]. At the August 30, 2012 hearing, the United States conceded that Defendant had a reasonable expectation of privacy in the house, and explained that its remaining contentions are: (1) Defendant does not have standing to suppress the identity of the undocumented immigrants; and (2) the police legally entered the curtilage of the residence pursuant to exigent circumstances. [*Doc. 56* at 4-6]. Specifically, the United States contends that Defendant has no standing with regards to the identity of the illegal immigrants who were seized at the house "because Defendant was not himself unlawfully detained or arrested." [*Doc. 66* at 2]. The United States further contends that Deputy Waldrop and Detective Brookhouser permissibly entered the curtilage of the property to look for Ms. Jacobsen, so their encounter with the illegal immigrants was not unlawful. *Id.* at 2-3.

### A.  Standing

The United States relies on *United States v. Olivares-Rangel*, 458 F.3d 1104 (10th Cir. 2006) for its argument that Defendant does not have standing with regard to the identity of the men found at the house.   In *Olivares-Rangel*, the Government conceded that the defendant was arrested illegally, but contended that the defendant could not challenge evidence related to his identity which allowed the Government to connect the defendant to a previous felony conviction.  458 F.3d at 1105. The Tenth Circuit held that suppression of identity evidence was barred only insofar as the purpose of the suppression was to establish a defense to jurisdiction, but a defendant may, in certain circumstances, challenge identity-related evidence obtained as a result of an illegal arrest.  *Id.* at 1111-12 (explaining the holding of *Immigration and Naturalization Service v. Lopez-Mendoza*, 468 U.S. 1032 (1984) that a defendant cannot suppress the entire issue of his identity, but a defendant may still seek to suppress specific pieces of evidence related to his identity, such as fingerprints or statements).  The Tenth Circuit then considered whether the defendant's statements, fingerprints, and A-file (which the Tenth Circuit explained is the defendant's immigration and prior criminal record) should be excluded under the circumstances present in that case.  *Id.* at 1112.  The Tenth Circuit considered whether the defendant had standing to challenge the introduction of his A-file because it is an independent government record that was brought to the Government's attention based on the defendant's illegal arrest.  *Id.* at 1117.  The Tenth Circuit explained that, "[w]hile the fruit of the poisonous tree doctrine applies only when the defendant has standing regarding the Fourth Amendment *violation* which constitutes the poisonous tree . . ., the law imposes no separate standing requirement regarding the *evidence* which constitutes the fruit of that poisonous tree."  *Id.* at 1117.  The Tenth Circuit further explained that "[a] defendant's standing to challenge the admissibility of evidence deemed fruit of an illegal search and seizure therefore arises from the

alleged violation of his Fourth Amendment rights by virtue of the primary illegality," and "[t]here is no independent requirement that a defendant also have standing or a proprietary interest in the items sought to be suppressed under the fruits of the poisonous tree doctrine." *Id.* at 1119 (citation omitted). Thus, the Tenth Circuit held that the defendant had standing to object to introduction of his A-file because it was the "poisonous fruit obtained as a result of that primary illegality." *Id.*[2]

Here, the search of the house is equivalent to the initial stop and arrest of the defendant in *Olivares-Rangel*, because that would be the "poisonous tree" from which any fruit must be suppressed. In contrast to *Olivares-Rangel*, however, where the Government conceded that the stop and arrest of the defendant was illegal (the "primary illegality"), here, the issue of whether the search and seizure of the men at the house is constitutional is contested by the parties. The United States has conceded that Defendant has standing to contest the officers' entry onto the curtilage of the house and the search of the house. If the entry and search of the house was not legal, then that would be the "primary illegality," and the holding in *Olivares-Rangel* makes it clear that Defendant does *not* need to have standing to contest any of the fruit from that "primary illegality." Therefore, Defendant does not need to establish standing regarding the men found as a result of the search. Similarly, in *Wong Sun v. United States*, 371 U.S. 471, 473-76, and 484-88 (1963), when it was found that the defendant's statements were illegally obtained (the "primary illegality"), the defendant had standing to suppress the drugs found at his co-defendant's house as a result of those

---

[2]The Tenth Circuit in *Olivares-Rangel* ultimately remanded the case to the district court to determine whether the defendant's fingerprints were obtained for the purpose of investigating the defendant's immigration status or prior criminal history, or whether they were obtained as part of a routine booking procedure, in which case both the fingerprints and the A-file (which was obtained as a result of the fingerprints) should not be suppressed. *Id.* at 1120-21. Such a determination is not an issue in this case because the United States does not contend that the identities of the men found at the house may have been obtained as part of a routine booking procedure. Instead, both parties agree that the immigration statuses of the men, which led to Defendant's arrest, were determined as part of the allegedly illegal search of the house.

statements (*i.e.*, the "fruits of the poisonous tree"), even though he did not have a reasonable expectation of privacy in his co-defendant's house.  The defendant there did not need to establish separate standing with regard to the drugs, just as Defendant here does not need to establish standing with regard to the men found at the house because the men are the *evidence*, or the fruits, of the allegedly illegal search of the house.  For these reasons, the Court finds that Defendant does not need to establish standing to suppress the identity of the men found at the house, and the Court recommends rejecting the United States' contention to the contrary.

### B.  Search of the Curtilage and of the House

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const. Amend. IV.  A warrantless search is unconstitutional if the defendant has a legitimate expectation of privacy in the area to be searched.  *United States v. Anderson*, 154 F.3d 1225, 1229 (10th Cir. 1998).  To establish a legitimate expectation of privacy, the defendant must show: (1) a subjective expectation of privacy in the area to be searched; and (2) that society is prepared to recognize that expectation as reasonable.  *Id.*  A defendant has a legitimate expectation of privacy in both the home and the curtilage of a home.  *Oliver v. United States*, 466 U.S. 170, 180 (1984). The curtilage is defined as "the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life."  *Id.* (citation and internal quotation marks omitted).  To determine whether an area is part of the curtilage, courts look at four factors: (1) the proximity to the home of the area claimed to be the curtilage of the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation from passers-by. *United States v. Dunn*, 480 U.S. 294, 301 (1987).  The defendant has the burden to present evidence

-8-

that the search was conducted within the curtilage.  *See United States v. Cavely*, 318 F.3d 987, 993-94 (10th Cir. 2003).

Defendant contends that, because Deputy Waldrop and Detective Brookhouser had to open two closed gates to gain access to the property, they improperly entered the property without a search warrant or probable cause.  [*Doc. 61* at 7].  The Court, however, finds that the evidence does not support this contention.  While Ms. Dworkin testified that the gates of the property are "closed at all times" to keep two dogs in (*Doc. 56* at 70), there was no evidence presented that Ms. Dworkin was at the house at the time of the allegedly illegal search.  Deputy Waldrop was asked three separate times on cross-examination about whether he or Detective Brookhouser had to stop to open any gates to gain access to the house, and his testimony was consistent that they did not have to open any gates and that, instead, they drove straight up to the house.  *See id.* at 36, 54 and 56.  This testimony is also consistent with the Offense/Incident Report prepared by Deputy Waldrop, which makes no mention of having to open any gates to gain access to the house.  *See Defendant's Exhibit A* at 2.  In addition, the pictures of the house show that the fence around the property does not prohibit or restrict the public's view of the house, nor does it indicate that the area "extends the intimate activity associated with the sanctity of a man's home and the privacies of life."  *Oliver*, 466 U.S. at 180 (citation and internal quotation marks omitted); *see Government's Exhibits 1* and *3*. The pictures also show that there is not a fence separating the front of the house from the back of the house, and the front and back of the house look very similar.  *See Government's Exhibits 2* and *3*.  As the Tenth Circuit has explained, "[w]hen the police come on to private property to conduct an investigation . . . and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment."  *United States v. Hatfield*, 333 F.3d 1189, 1194 (10th Cir. 2003)

(citation and internal quotation marks omitted).  "[A]ny observations made by [the officer] while standing on [the defendant's] driveway do not constitute a search under the Fourth Amendment." *Id.* at 1195.  The Court, therefore, finds that Deputy Waldrop and Detective Brookhouser properly entered the property surrounding the house because that area was not protected as part of the curtilage of the house.  *See, e.g., United States v. Lewis*, 240 F.3d 866, 871 (10th Cir. 2001) (holding that even property surrounded by an eight-foot fence, locked gates, and numerous signs reading "No Trespassing" and "Private Game Shelter" was not entitled to an expectation of privacy, relying on *Oliver*, and denying a motion to suppress evidence gathered by entry onto that property); *Smith v. Board of County Comm'rs for County of Chaves*, No. 11-2205, 468 Fed. Appx. 843, 848, 2012 WL 759890 (10th Cir. March 9, 2012) (unpublished) ("If the Smiths' front door was openly visible and accessible to the public, the deputies in this case did not need a warrant or probable cause to approach it."); *Galindo v. Town of Silver City*, No. 03-2134, 127 Fed. Appx. 459, 466, 2005 WL 762120 (10th Cir. April 5, 2005) (unpublished) ("Merely proceeding from the front to the back of a house alone . . . did not establish an invasion of the curtilage in violation of the Fourth Amendment.").

The Court also finds that there was no violation of Defendant's constitutional rights when the two men came out of the house and willingly answered questions about their immigration status, and that Detective Brookhouser's entry into the house was justified.  Under the "exigent circumstances" exception, officers may conduct a warrantless entry when: "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of themselves or others, and (2) the manner and scope of the search is reasonable." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006).  The Court finds that there was an objectively reasonable basis to believe there was an immediate need to protect lives because: (1) there was smoke coming

out of the house, indicating there was a fire inside; (2) the two men who had come out of the house said that there was a third person inside the house; and (3) Deputy Waldrop and Detective Brookhouser had reason to think that Ms. Jacobsen may have been in the house, as well. *See Najar*, 451 F.3d at 714 ("'[A] warrant is not required to break down a door to enter a burning home to rescue occupants or extinguish a fire.'") (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C.Cir. 1963). The Court finds that the manner and scope of the search was reasonable. To summarize, after receiving information from a tipster who had found a woman in her driveway suffering from a beating allegedly at the hands of Defendant, the officers were entitled to go to the victim's home to make sure she was all right. They drove into the yard through an open gate and went up to the house and knocked on the door. When no one answered, they looked inside the windows. They did not enter the home at that time and, instead, two men voluntarily exited the home. The officers spoke to the men and learned that they were undocumented aliens and that there was a third man in the house. The officers had just seen smoke billowing out of a door on the second floor and properly entered the house under the exigency of a potential fire in the home and, at the same time, out of concern that the victim of domestic violence might also be inside. The officer did not search the house, other than to look for people in the house, and did not open drawers. *See* [*Doc. 56* at 24-25]. Under these circumstances, the officers acted lawfully and did not violate Defendant's constitutional rights. For these reasons, the Court finds that exigent circumstances justify Detective Brookhouser's entry into the house, so the subsequent identification of the third man was not a violation of Defendant's constitutional rights. Therefore, the Court recommends denying Plaintiff's motion to suppress.

-11-

### III. Conclusion

Based on the foregoing, the Court finds that Defendant has standing to move to suppress the identity of the men found in the search of the property to which he had an expectation of privacy, and that Deputy Waldrop and Detective Brookhouser acted lawfully in entering the property and the house.   The Court, therefore, recommends that ***Steven Kasey Dupree's Motion to Suppress (Doc. 40)*** be **DENIED**.

### RECOMMENDED DISPOSITION

The Court recommends that  ***Steven Kasey Dupree's Motion to Suppress*** *(Doc. 40)* be **DENIED**.

*Lourdes A. Martinez*
_____
**HONORABLE LOURDES A. MARTÍNEZ**
**United States Magistrate Judge**

-12-